UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | | |
|---|---|---|
| MURRIEL-DON COAL COMPANY, INC., | ) ) ) | |
| Plaintiff, | ) ) | Civil No. 11-23-ART |
| v. | ) ) ) | **MEMORANDUM OPINION** |
| ASPEN INSURANCE UK LIMITED, et al., | ) ) ) | **AND ORDER** |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

When a fisherman wants his boat to stay put in a harbor, he ties it to a dock. When a plaintiff wants his case to stay put in state court, he ties it to a non-diverse defendant. But that might not always be enough to keep the case moored where the plaintiff wants it. Under the doctrine of "fraudulent joinder," federal courts may sever the non-diverse defendant from the case if the claim against him is so frivolous that its only conceivable purpose is to destroy diversity and prevent removal. The two diverse defendants in this case, Aspen Insurance UK Limited and Aspen Specialty Insurance Company (collectively "Aspen"), ask the Court to use its fraudulent-joinder scissors to cut loose the two non-diverse defendants, Bridget Dunaway and her law firm, Tooms & Dunaway, PLLC (collectively "Dunaway"), thereby allowing the case to sail smoothly to federal court. Because Aspen has not met the stringent requirements for establishing fraudulent joinder, the plaintiff's motion to remand is granted.

# BACKGROUND

October 30, 2008, had been a long day for Tony Amburgey, who worked as a roof bolter at a mine operated by Murriel-Don Coal. Amburgey was especially tired when he left work that evening. While driving home, he fell asleep at the wheel and collided with another car, seriously injuring its occupants, Albert Hudson and Roberta Jent. Hudson and Jent sued Amburgey in Kentucky state court. A few months later, they both amended their complaints to include a claim against Murriel-Don. Their amended complaints alleged that Murriel-Don had been directly negligent because it failed to "take proactive measures to reduce fatigue in its employees" and "allowed Amburgey to leave its premises in a state that it knew or should have known to be a danger to the other motorists on the highway." R. 14-3 at 4.

After receiving a copy of the complaint, Murriel-Don notified Aspen, its insurance carrier, of the claim. Murriel-Don had a commercial general liability policy with Aspen when the accident occurred. The policy obligated Aspen to defend lawsuits filed against Murriel-Don seeking damages for bodily injury or property damage. R. 1-2 at 3. But the policy contained an express exclusion providing that it did not cover any liability arising out of the operation of automobiles. The exclusion read: "This policy is not in any way to be construed to provide any type of automobile liability or other motorized vehicle liability coverage. If this type of coverage is desired it should be specifically purchased from a carrier that provides such coverage." R. 14-1 at 32.

Initially, Aspen arranged for Bridget Dunaway, of the law firm Tooms & Dunaway, PLLC, to defend Murriel-Don in the Jent/Hudson action. After reviewing the case file, Dunaway advised Murriel-Don that she believed service of process on the company had been

defective under state law, but that Murriel-Don should waive the defect and file a motion to dismiss. Dunaway entered an appearance in the state court on behalf of Murriel-Don on August 21, 2009. She waived the objection to defective service of process and filed a motion to dismiss the claims against Murriel-Don on August 26, 2009.

In the meantime, Aspen determined that its insurance policy did not in fact cover the Jent/Hudson action because the plaintiffs' claims fell within the policy's automobile exclusion. Aspen sent Murriel-Don a letter on September 9, 2009, informing it that, if the court denied the motion to dismiss that Dunaway had already filed, Aspen would no longer pay for Murriel-Don's defense. Sure enough, the state trial court denied the motion to dismiss in a brief order on October 29, 2009. Aspen then sent Murriel-Don a supplemental letter denying coverage. Aspen formally terminated Dunaway's legal services on November 24, 2009, and Dunaway filed a motion to withdraw the next day.

Even though Murriel-Don no longer had an attorney, the state-court litigation pressed forward. Murriel-Don failed to respond to requests for admission from the plaintiffs, and as a result, the state court deemed Murriel-Don to have admitted both liability and damages. On March 20, 2010, the state court entered default judgment against Murriel-Don and awarded Roberta Jent $27,000,000 in damages (plus 12% interest) and Albert Hudson $15,000,000 in damages (plus 12% interest).

Some months later, on November 5, 2010, Murriel-Don filed suit against Aspen, Dunaway, and Tooms & Dunaway in the Knott Circuit Court. R. 1-2. Murriel-Don asserted several claims against Aspen—for breach of contract, breach of the duty to defend, and violation of Kentucky's Unfair Claims Settlement Practices and Consumer Protection Acts,

3

R. 1-2 at 11-17—and two claims against Dunaway and her law firm—for legal malpractice and breach of fiduciary duty, *id*. at 17-19. Aspen filed a notice of removal on February 16, 2011, R. 1, to which Dunaway and her law firm consented, R. 2. Murriel-Don filed a motion to remand on February 25, 2011. R. 7.

**ANALYSIS**

Glancing at the complaint in this case raises a bright red jurisdictional flag. There are no federal questions involved, so the only possible basis for federal jurisdiction is diversity. For this Court to have diversity jurisdiction under 28 U.S.C. § 1332, there must be *complete* diversity—no defendant may have the same citizenship as the plaintiff. *See Lincoln Property Co. v. Roche*, 546 U.S. 81, 89 (2005). The plaintiff, Murriel-Don, is a citizen of Kentucky. And so are defendants Bridget Dunaway and Tooms & Dunaway, PLLC. Complete diversity is lacking. Nevertheless, Aspen asks the Court to invoke one of two doctrines—"fraudulent joinder" or "fraudulent misjoinder"—to sever Dunaway from the case, thereby creating complete diversity and allowing removal. For the reasons that follow, the Court declines to do so.

1.  **Fraudulent Joinder**

Fraudulent joinder is "a judicially created doctrine that provides an exception to the requirement of complete diversity." *Coyne v. Am. Tobacco Co.*, 183 F.3d 488, 493 (6th Cir. 1999) (quoting *Triggs v. John Crump Toyota, Inc.*, 154 F.3d 1284, 1287 (11th Cir. 1998)). It allows defendants to remove cases lacking complete diversity if they demonstrate that the plaintiff included claims against non-diverse defendants "for the sole purpose of preventing removal." *McLeod v. Cities Serv. Gas Co.*, 233 F.2d 242, 246 (10th Cir. 1956). In this

4

circuit, the removing party makes this showing by establishing that the plaintiff has "no colorable cause of action" against the non-diverse defendant. *Saginaw Hous. Comm'n v. Bannum, Inc.*, 576 F.3d 620, 624 (6th Cir. 2009). If the claim is so frivolous that it has no hope of success, the court presumes that the plaintiff made the claim for the sole purpose of preventing removal and retains jurisdiction. *Id*.

### A. Problems with the Fraudulent-Joinder Doctrine

Fraudulent joinder is a well-established doctrine. Like other well-established doctrines, though, fraudulent joinder suffers from a common problem—courts rarely stop and think about whether the doctrine makes sense. But just as a wise homeowner regularly inspects his house's foundation for signs of termite damage, so too is it worthwhile for judges from time to time to examine the foundations of even well accepted legal doctrines. A closer look at fraudulent joinder reveals a doctrine resting on a rickety foundation.

Fraudulent joinder dates back to the turn of the last century. That era saw a spate of tort actions against large industrial companies, often railroads, brought by employees injured on the job. To prevent removal of these cases to federal court, the plaintiffs would often join other in-state employees. *See* E. Farish Percy, *Making a Federal Case of It: Removing Civil Cases to Federal Court Based on Fraudulent Joinder*, 91 Iowa L. Rev. 189, 191 (2005). To preserve the companies' ability to remove these cases to federal court, the Supreme Court "rather abruptly announced that sham parties could be ignored when determining whether complete diversity of citizenship was present in a case." James M. Underwood, *From Proxy to Principle: Fraudulent Joinder Reconsidered*, 69 Alb. L. Rev. 1013, 1031 (2006). In *Wecker v. National Enameling & Stamping Co.*, 204 U.S. 176 (1907), the first case in which

the Court found that a plaintiff had been fraudulently joined, the Court announced that "the Federal courts should not sanction devices intended to prevent a removal to a Federal court where one has that right." *Id*. at 186. The Court elaborated further in *Chesapeake & Ohio Ry. Co. v. Cockrell*, 232 U.S. 146 (1914): The "right of removal cannot be defeated by a fraudulent joinder of a resident defendant having no real connection with the controversy. So, when in such a case a resident defendant is joined with the non-resident, the joinder . . . may be shown by a petition for removal to be only a fraudulent device to prevent a removal." *Id*. at 152 (citations omitted). Then, just as quickly as it had materialized, the doctrine of fraudulent joinder disappeared from the United States Reports. *Wilson v. Republic Iron & Steel Co.*, 257 U.S. 92, 97-98 (1921), was the last Supreme Court decision to address fraudulent joinder. The Court never explained a rationale for the doctrine "other than that the Court apparently was opposed to plaintiffs pleading claims against defendants solely to defeat federal court jurisdiction." Underwood, *supra*, at 1038. In the ninety years since, the lower courts have struggled to cogently define the doctrine and articulate a valid justification for it. Their efforts have not been successful.

First, and most fundamentally, it is unclear where federal courts get the authority to decide whether a defendant has been fraudulently joined. The most basic of first principles governing judicial authority is that "[w]ithout jurisdiction [a] court cannot proceed at all in any cause." *Ex parte McCardle*, 7 Wall. 506, 514 (1868). Because the Constitution vests federal courts with only limited jurisdiction, the "requirement that jurisdiction be established as a threshold matter . . . is 'inflexible and without exception.'" *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94-95 (1998) (quoting *Mansfield, C. & L.M.R. Co. v.*

*Swan*, 111 U.S. 379, 382 (1884)). If the court determines that it lacks jurisdiction, "the only function remaining to the court is that of announcing the fact and dismissing the cause." *Id.* at 94 (quoting *McCardle*, 7 Wall. at 514).

Despite this ancient maxim that courts may not act without jurisdiction, the fraudulent-joinder inquiry requires them to do just that. The court must examine the plaintiff's claim against the non-diverse defendant—a claim over which it affirmatively lacks jurisdiction—and determine whether the allegations state a "colorable basis" for relief under state law. *Coyne*, 183 F.3d at 493. And that's not all. Several other circuits require courts to go even deeper—to "pierc[e] the pleadings" and consider "summary judgment-type evidence such as affidavits and deposition testimony" in assessing whether the cause of action is valid. *Cavallini v. State Farm Mut. Auto. Ins. Co.*, 44 F.3d 256, 263 (5th Cir. 1995) (internal quotation marks and citation omitted); *see also Legg v. Wyeth*, 428 F.3d 1317, 1322-23 (11th Cir. 2005). If the court determines that the non-diverse defendant has been fraudulently joined, the remedy is to dismiss the claims against him. *See Council Tower Ass'n v. Axis Specialty Ins. Co.*, 630 F.3d 725, 730-31 (8th Cir. 2011) (affirming district court's dismissal of claims against non-diverse defendant). True, this is a "limited . . . examination of the merits of the [] claims," not a full blown adjudication. *Winburn v. Liberty Mut. Ins. Co.*, 933 F. Supp. 664, 666 (E.D. Ky. 1996). But just as one cannot be a little bit pregnant or a little bit dead, the notion that courts can have a little bit of jurisdiction—enough for a quick peek at the merits of a claim, but no more—runs contrary to bedrock principles. *See McCardle*, 7 Wall. at 514 ("Without jurisdiction [a] court cannot proceed *at all* in any cause.") (emphasis

7

added); *May v. Wal-Mart Stores, Inc.*, 751 F. Supp. 2d 946, 951 (E.D. Ky. 2010) ("Federal jurisdiction is a binary choice. The switch is either on or off.").

The "familiar law that a federal court always has jurisdiction to determine its own jurisdiction," *United States v. Ruiz*, 536 U.S. 622, 628 (2002), does not salvage fraudulent joinder. If the Constitution or a statute authorizes federal jurisdiction in only limited circumstances, such as where the parties are of diverse citizenship, it is unobjectionable that a federal court has jurisdiction to determine whether those jurisdictional prerequisites are satisfied. Fraudulent joinder, though, requires courts to do something quite different. It requires courts to examine the merits of claims over which *everyone agrees* the court lacks jurisdiction. That is a very different enterprise from determining whether the court has jurisdiction over the claim in the first place.

Admittedly, at the heart of fraudulent joinder is an understandable impulse: Plaintiffs should not be able to play games with federal jurisdiction. If a Kentucky plaintiff sues a New York insurance company, he should not be able to tether the case to state court by also including a frivolous claim against Rick Pitino for causing extreme emotional distress by failing to take the University of Louisville Cardinals past the first round of the NCAA tournament. But from the desire to prevent this kind of extreme abuse has sprung a judicially created doctrine that invites federal courts to exceed their jurisdiction. And the doctrine has also probably caused more trouble than benefits. Fraudulent joinder has all the clarity one would expect from a legal rule fashioned entirely from judges' imaginations. In the absence of guidance from the Supreme Court over the past ninety years, courts of appeals have splintered over critical questions such as the proper standard for judging the plaintiff's

8

chances of success on his claim against the non-diverse defendant; whether courts are limited to examining the state court pleadings or whether they may (or must) consider extrinsic evidence such as affidavits and deposition transcripts; and whether courts should evaluate the plaintiff's claim using a standard akin to a motion to dismiss under Rule 12(b)(6) or something else. *See* Matthew J. Richardson, *Clarifying and Limiting Fraudulent Joinder*, 58 Fla. L. Rev. 119, 146-64 (2006) (detailing circuit splits); Underwood, *supra*, at 1045-85 (same).

There is a better way. Instead of exercising jurisdiction where none exists using a fractured, judicially created doctrine, why not allow the state courts to determine whether the claims against non-diverse defendants are valid? *See* 14B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3723 (4th ed.) ("In many situations, confusion could be reduced if removing parties would challenge fraudulent joinders and misjoinders in state court, before defendants file a removal notice."). If a claim against a non-diverse defendant is truly frivolous, surely the state court would grant a motion to dismiss the claim in relatively short order. Instead of requiring federal courts to venture their best guess at whether a state-law claim is colorable, it makes much more sense to leave the decision to the state courts, who are experts on questions of state law. *See, e.g.*, *Tafflin v. Levitt*, 493 U.S. 455, 465 (1990) (recognizing that "state courts presumably have greater expertise" at evaluating "violations of state law"); *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 818 (1989) (recognizing that "question[s] of state law [are] within the special expertise of the [state] courts"). This approach would eliminate the unseemly practice of federal courts acting on claims over which they lack jurisdiction, thus preventing the federal judiciary from

"poach[ing] upon the territory of a coordinate judicial system." *B., Inc. v. Miller Brewing Co.*, 663 F.2d 545, 548 (5th Cir. 1981).

Leaving it to the state courts is not a novel approach. More than 130 years ago, the Supreme Court held that, for a defendant to remove a case from state to federal court, "[t]he record in the State court . . . should be in such a condition when the removal takes place as to show jurisdiction in the court to which it goes." *Gold-Washing & Water Co. v. Keyes*, 96 U.S. 199, 201 (1877). Applying this well established principle, this Court recently held in *May v. Wal-Mart* that a defendant may only remove a case to federal court if the record at the time of removal establishes that the amount in controversy more likely than not exceeds the $75,000 jurisdictional minimum. 751 F. Supp. 2d at 951. If it does not, the defendant may not use the federal court's authority to conduct discovery into the amount in controversy. *Id*. at 955. Instead, the defendant must return to state court and conduct discovery there. He may come back to federal court if he adduces sufficient evidence to establish that the amount in controversy more likely than not exceeds $75,000. *Id*. at 953. The same principles apply here, arguably with greater force. If complete diversity is lacking, the "record in the State court" is not "in such a condition when the removal takes place as to show jurisdiction in the" federal court. *Keyes*, 96 U.S. at 201. If it offends federalism for the federal court to retain jurisdiction to allow the parties to conduct limited jurisdictional discovery, *see May*, 751 F. Supp. 2d at 950-52, it is significantly more offensive for the federal court to dismiss a claim over which it lacks jurisdiction. The better course is for the court to remand the case and allow the state court to dismiss the claims against the non-diverse defendants if those claims truly present no hope of success. Once the state court dismisses the non-diverse

defendants from the case, the remaining diverse defendants would have thirty days to file a notice of removal under 28 U.S.C. § 1446(b). *See King v. Household Fin. Corp. II*, 593 F. Supp. 2d 958, 960 n.2 (E.D. Ky. 2009).

For these reasons, fraudulent joinder makes little sense. It requires federal courts to exercise jurisdiction where none exists over questions of state law that the state courts are better suited to address themselves. Nevertheless, altering the fraudulent-joinder doctrine is a decision that is above this Court's pay grade. Fraudulent joinder is still the law of this circuit, and until the law changes, this Court will faithfully apply it.

### B. Aspen Has Not Established Fraudulent Joinder

To establish fraudulent joinder and avoid remand, Aspen must establish that there is no "colorable basis for predicting" that Murriel-Don will be able to recover against Dunaway. *Coyne*, 183 F.3d at 493. If Murriel-Don's malpractice claim against Dunaway has even a "glimmer of hope," there is no fraudulent joinder. *Hartley v. CSX Transp., Inc.*, 187 F.3d 422, 426 (4th Cir. 1999). This is a "heavy burden," *Mayes v. Rapoport*, 198 F.3d 457, 463 (4th Cir. 1999), and it is one that the defendants have failed to carry.

Murriel-Don has stated a colorable claim against Dunaway for legal malpractice. To prevail on a legal malpractice claim under Kentucky law, the plaintiff must prove that (1) there was an attorney/client employment relationship; (2) the attorney failed to "exercise the ordinary care of a reasonably competent attorney acting in the same or similar circumstances"; and (3) the attorney's negligence proximately caused the plaintiff's injury. *Marrs v. Kelly*, 95 S.W.3d 856, 860 (Ky. 2003) (quoting *Stephens v. Denison*, 64 S.W.3d 297, 298-99 (Ky. Ct. App. 2001)). Murriel-Don has alleged the existence of an

11

attorney/client relationship with Dunaway, R. 1-2 at 7, and the defendants have not argued otherwise. The first element is therefore satisfied. For the second element, Murriel-Don alleges that Dunaway failed to exercise the ordinary care of a reasonably competent attorney in three ways: (1) by not challenging defective service of process by the plaintiffs, (2) by filing a motion to dismiss that relied on an incorrect theory of liability, and (3) by not informing Murriel-Don that she had been retained for the limited purpose of filing a motion to dismiss. R. 1-2 at 17-18. Notwithstanding Aspen's efforts to denigrate these claims, there is at least a glimmer of hope that Murriel-Don will prevail on at least one of them.

Murriel-Don could prevail on its claim that Dunaway acted unreasonably by failing to appreciate the nature of the claim that the plaintiffs advanced against Murriel-Don. Murriel-Don alleges that Dunaway's motion to dismiss did not recognize that that the plaintiffs' claims relied on a theory of direct negligence, not vicarious liability. Aspen argues that this claim is "completely false" because the briefs Dunaway filed acknowledged that the plaintiffs had advanced a direct-liability claim against Murriel-Don. It is true that Dunaway's motion to dismiss contains one sentence acknowledging that the plaintiffs' claim was based on direct liability. R. 14-6 at 2 ("Plaintiff and Intervening Plaintiff argue the novel concept that Murriel-Don owes a duty to prevent its employees from driving when they may be too tired to navigate to their homes safely."). But the motion devotes 100% of its legal arguments to establishing that Murriel-Don was not *vicariously* liable for Amburgey's negligence because Amburgey was not acting in the course of his employment when the accident occurred. All of the cases she cited dealt with vicarious liability; none dealt with direct liability. Thus, although she "spotted the issue" of direct negligence, she devoted

absolutely no legal analysis to it. The reply that Dunaway filed fares only marginally better. In barely one page of legal analysis, the reply more directly acknowledges that Dunaway was "fully aware that plaintiffs' theory is one of direct liability." But the reply simply argues that "there is no authority that would support plaintiffs' direct causes of action against" Murriel-Don. R. 14-8 at 1. Again, no cases, no statutes, no real legal argumentation of any kind. Dunaway's lackluster arguments might very well explain why the state court denied her motion in a one-sentence order. R. 14-10. There is certainly a glimmer of hope on this claim. A jury could conclude that Dunaway did not perform reasonably when she failed to present meaningful legal arguments directly rebutting the plaintiffs' theory of direct liability against Murriel-Don.

The Court could go on and evaluate whether Murriel-Don also has a colorable legal malpractice claim against Dunaway based on her failure to challenge the plaintiffs' defective service of process or to advise Murriel-Don that she had been hired for a limited purpose, or whether Murriel-Don also has a colorable claim for breach of fiduciary duty. But there is really no need. As demonstrated above, Murriel-Don has at least one colorable claim for legal malpractice against Dunaway. Will Murriel-Don prevail on this claim? Maybe, maybe not. But is it at least conceivable that Murriel-Don could prevail? The answer to that question is yes, and it ends the fraudulent-joinder inquiry.

Aspen makes one last-ditch effort to establish that Murriel-Don has no hope of success on its malpractice claim against Dunaway. Aspen argues that, even if Dunaway performed deficiently, it was not her negligence that caused Murriel-Don's injuries. Instead, Aspen argues that it was Murriel-Don's failure to retain new counsel after Dunaway

13

withdrew that led to the entry of default judgment against it. R. 14 at 23-26. This argument fails. First of all, if Dunaway's failure to make the right arguments in the motion to dismiss constituted legal malpractice, a jury could conclude that it directly caused Murriel-Don's injuries. After all, if the motion had been granted, there would have been no default judgment. But beyond that obvious logical inconsistency, Aspen's argument is simply too creative for purposes of fraudulent-joinder analysis. Aspen relies on decisions from Louisiana, Arkansas, Georgia, and New York to spin an argument that Murriel-Don's failure to retain new counsel constitutes an intervening cause, thereby severing the link between Dunaway's negligence and Murriel-Don's injury and destroying proximate causation. R. 14 at 23-26. Aspen should certainly make this argument in state court, and it might even succeed. But fraudulent joinder is neither the time nor the place for innovative legal arguments, and Aspen has cited to no Kentucky cases clearly establishing that Murriel-Don's claim against Dunaway will fail on causation grounds. Accordingly, Aspen has not established that Dunaway was fraudulently joined.

### 2. Fraudulent Misjoinder

Aspen also argues that, even if Dunaway was not fraudulently joined, she was fraudulently *mis*joined. Fraudulent misjoinder arguably occurs when a plaintiff joins a valid, but unrelated, claim against a non-diverse defendant in order to defeat diversity. For example, if a Kentucky plaintiff sues an Ohio driver for injuries sustained in a car crash and also includes a claim against a Kentucky plastic surgeon for a botched facelift that happened six months earlier, fraudulent joinder would not apply because the claim against the plastic surgeon is colorable. Fraudulent misjoinder, on the other hand, could allow the federal court

to sever the claim against the non-diverse plastic surgeon because, although colorable, it is entirely unrelated to the claim against the Ohio driver.

Unlike fraudulent joinder, which has been around for quite some time, fraudulent misjoinder is relatively new. The Eleventh Circuit invented the doctrine in *Tapscott v. MS Dealer Service Corp.*, 77 F.3d 1353, 1360 (11th Cir. 1996). There, the court held that the plaintiffs had fraudulently misjoined non-diverse defendants because, although the plaintiffs had "colorable claims against" them, those defendants had "no real connection with the controversy involving" the out-of-state defendants. *Id.* The court therefore held that the non-diverse defendants had been misjoined under Rule 20 of the Federal Rules of Civil Procedure. The Eleventh Circuit is still the only circuit to have expressly adopted fraudulent misjoinder, although the Fifth, Eighth, and Ninth Circuits have acknowledged the doctrine without either expressly accepting or rejecting it. *See In re Prempro Prods. Liab. Litig.*, 591 F.3d 613, 620 n.4 (8th Cir. 2010) (citing cases). The Sixth Circuit has not yet spoken. *See Geffen v. Gen. Elec. Co.*, 575 F. Supp. 2d 865, 869 (N.D. Ohio 2008). In the absence of binding circuit law, district courts within the circuit have splintered over whether to apply the doctrine. One district court has adopted and applied the doctrine, *Asher v. Minn. Mining & Mfg. Co.*, No. 04-522, 2005 WL 1593941, *4-9 (E.D. Ky. June 30, 2005), while other district courts have rejected it, *see Geffen*, 575 F. Supp. 2d at 871-72; *Bird v. Carteret Mortg. Corp.*, No. 2:06-CV-588, 2007 WL 894841, at *3-5 (S.D. Ohio Mar. 22, 2007). The undersigned previously gave a brief nod to the doctrine in a footnote, quickly brushing aside a claim of fraudulent misjoinder in *McKinstry v. Sergent*, 442 B.R. 567, 572 n.2 (E.D. Ky. 2011).

Now that the question is squarely presented, the Court concludes that the better course is not to apply fraudulent misjoinder. This conclusion flows naturally from the Court's discussion above of the difficulties with fraudulent joinder. Fraudulent misjoinder shares all of these same difficulties and suffers from arguably greater doctrinal complexity. *See Geffen*, 575 F. Supp. 2d at 871 ("Conducting fraudulent misjoinder analysis [] necessarily requires the Court to wade into a thorny thicket of unsettled law; disagreements exist as to numerous questions about the doctrine . . . ."); *Walton v. Tower Loan of Miss.*, 338 F. Supp. 2d 691, 695 (N.D. Miss. 2004) ("[T]he governing legal standards regarding the fraudulent misjoinder doctrine are far from clear."). Among the unsettled doctrinal questions are whether the court analyzes the propriety of the joinder under state or federal law, *see Osborn v. Metro. Life Ins. Co.*, 341 F. Supp. 2d 1123, 1128 (E.D. Cal. 2004), and how blatant the misjoinder has to be for it to rise to the level of "fraudulent." In *Tapscott*, the Eleventh Circuit said that joinder of the non-diverse defendants must be more than simply incorrect; it must be "egregious." 77 F.3d at 1360. Other district courts require a lesser standard. *See Asher*, 2005 WL 1593941, at *5 (collecting cases).

While this Court was obligated to recognize and apply fraudulent joinder by binding Sixth Circuit precedent, its hands are not similarly tied with respect to fraudulent misjoinder. Therefore, in light of the questionable basis of the Court's authority to conduct fraudulent-misjoinder analysis and the numerous unsettled doctrinal questions, the Court agrees with the other district courts that have left the whole enterprise to the state courts. *See Osborn*, 341 F. Supp. 2d at 1127; *Geffen*, 575 F. Supp. 2d at 871. After remand, Aspen may try to convince the Kentucky courts that Dunaway has been improperly joined in this action. If Aspen

succeeds and the state courts sever Dunaway from the case, Aspen may file another notice of removal within thirty days. *See* 28 U.S.C. § 1446(b).

Alternatively, even if the Court were to apply the doctrine, Dunaway and Aspen have not been fraudulently misjoined. It is true, as Aspen points out, that the claims against Aspen and Dunaway arise from different sources of law—the claims against Aspen from the insurance contract and the claims against Dunaway from the attorney/client relationship. R. 14 at 27-28. But the test for joinder is not whether claims arise from the same source of law. Rather, joinder is appropriate (under both the Federal and Kentucky Rules of Civil Procedure) if the plaintiff's claims arise from the same "transaction, occurrence, or series of transactions or occurrences" and "any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a)(2); Ky. R. Civ. P. 20.01. Murriel-Don's claims against Aspen and Dunaway meet these requirements. As Aspen concedes, the claims share common questions of fact. R. 14 at 27. And they also arise out of the same "transaction, occurrence, or series of transactions or occurrences." Murriel-Don alleges that Aspen's failure to provide a full defense *coupled with* Dunaway's malpractice led to the default judgment against it. Therefore, even if the Court were to recognize and apply the doctrine of fraudulent misjoinder, it has not been satisfied here.

3. **Attorney's Fees**

Murriel-Don also asks the Court to award it attorney's fees under 28 U.S.C. § 1447(c), which provides that "[a]n order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." Courts should only award attorney's fees under § 1447(c) if "the removing party lacked an

17

objectively reasonable basis for seeking removal." *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141 (2005). Here, Aspen's arguments regarding fraudulent joinder and fraudulent misjoinder have come up short. But the Court cannot say that the arguments were "objectively unreasonable." Fraudulent joinder is the law of this circuit, and fraudulent misjoinder has been adopted by many federal courts. Aspen's arguments for the application of both doctrines, although they did not carry the day, were at least reasonable arguments. Accordingly, this is not one of those rare cases where an award of attorney's fees is justified.

## CONCLUSION

Because complete diversity is lacking, the Court must remand this case to the Knott Circuit Court. The Court does not reach Murriel-Don's alternative argument that remand is required because Aspen did not file its notice of removal within thirty days of receiving the complaint. It is **ORDERED** that Murriel-Don's motion to remand, R. 7, is **GRANTED**. All other pending motions are **DENIED AS MOOT** and this case is **STRICKEN** from the Court's active docket.

This the 20th day of May, 2011.

Signed By:
Amul R. Thapar  AT
United States District Judge